## McGinity *versus* McGinity.

1. That there is a resulting trust, and that a deed is a mortgage, may be proved by oral testimony, but the evidence ought to be clear, explicit and unequivocal.

2. Where a trust, or the conversion of an absolute deed into a mortgage, is attempted to be made out by parol evidence, the court and jury exercise the functions of a chancellor, and the evidence ought to be such as would satisfy his conscience.

3. Conversations and negotiations prior and leading to a written contract are evidence to prove a fraud or trust, but there should be clear evidence that the arrangement continued up to the time of executing the writing.

October 30th 1869. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

[McGinity v. McGinity.]

Error to the Court of Common Pleas of *Westmoreland county:* No. 174, to October and November Term 1869.

This was an action of ejectment by Bridget McGinity and others, heirs of Thomas McGinity deceased, against May McGinity and John Crosby for about 94 acres of land in Derry township, Westmoreland county, the legal title to which was in John Mc-Ginity, deceased, the plaintiffs claiming that it was held in trust for their ancestor, Thomas McGinity. The writ was issued August 13th 1860. Both parties claimed under John Mason. The plaintiffs gave in evidence a deed dated December 6th 1850 from Mason to John McGinity, deceased, for the land in contro-versy, the consideration being $2000.

On the trial before Buffington, P. J., Mason testified that he having the land for sale Thomas McGinity came to see him in the spring of 1860 about purchasing; he examined the farm, said he was looking out for a small farm, said he wished to look at other farms, and went away; returned some time afterwards, inquired about payment; witness told him the price was $2000 and he wanted it all down; Thomas returned again, said he could not buy himself, but had a brother who said he would "lend him $600 and not charge him interest if not paid for seven years;" this was the 3d of July. John and Thomas afterwards came together; John said it was a poor farm, he would not give $14 per acre for his own use, nor would Thomas buy if it were not for the church in Blairsville. To this Thomas assented, and said he would take the place; the witness said to John that Thomas had told him that he would lend him $600 and not charge him interest for seven years. John said, "I did say so and will do it," that Thomas had been unlucky and it was now for him (John) to do something for him. John said if he lent Thomas $600 he must have the writings drawn in his own name, that he would pay the money and hold the land for security. Thomas said he was a practical farmer, and if he had his health, would have the deed in his own name in three years. They went away. They came again and witness agreed to sell for $2000—$1600 to be paid down and $200 per annum, without interest; $200 of the $1600 to be paid before signing the article. When the parties met to execute the article, the witness wanted to reserve the crops; John would not consent; Thomas said it was a small matter; they separated with-out doing anything; Thomas and witness met again; witness yielded as to the grain. Thomas said he could do nothing; as John was not at home. Afterwards the three met; John said the article was to be drawn in his name; Thomas did not object. "John put his hand into his pocket-book and counted down not quite $200, he asked Thomas for it and he got it." Thomas said the money was at Holmes's, Pittsburg, and a time must be set for him to have it. Witness told Thomas he must have the money in gold as he had

agreed. At the time appointed the three met, John took out his pocket-book, all standing around, and counted $1400 in paper; witness said to Thomas the bargain was for gold; Thomas said that was good. The deed and mortgage were afterwards executed; witness handed the deed to John, he handed it to Thomas, and said "take that, it is for you, anyhow," or "well, it is for you," witness did not recollect which. Thomas took the deed and put it into his pocket. Witness lived on the place until the succeeding April 1st. Thomas and his family moved on the place and witness left. John paid the balance on the mortgage.

Bernard Hanna testified that John said he wanted money, he had to pay for Thomas's place. There was other evidence of declarations by John that the land belonged to Thomas, and of Thomas acting as if owner of the land. Thomas died in 1852; John took possession of the land soon afterwards, and died in 1853; the defendant, May McGinity, is his widow, and has resided there since.

The plaintiffs gave evidence of the rental value of the farm during John's possession.

The defendants gave in evidence a letter from Mason to John McGinity, dated September 28th 1850, in which he says that Mrs. McGinity had told him (Mason) that John would pay $2000 for the place, which he said he would take and allow him to move into the house; also articles of agreement, dated November 5th 1850, by which Mason agreed to convey his farm to John, for $2000; $200 in hand, $1400 on delivery of the deed, and the remainder in two equal annual payments without interest, with receipts endorsed for $200 and $1400. Also, the administration account on Thomas's estate, filed March 26th 1855, showing that the amount of the assets was $634.83; taken by the widow $300, and, after deducting credits for expenses, &c., leaving for distribution amongst creditors a balance of $216.78. Also, the auditor's report showing the amount of debts to be $1906.09; amongst which was one claim of John for $114.49, and another of $125, "being one year's rent of a farm under a lease to said Thomas McGinity, deceased, dated 1st January A. D. 1851." This was allowed in full, and after expenses of the audit, $48.85 were left to be applied to the claims of general creditors. John McGinity's estate got $3.14 on his other claim.

D. Dunlop testified that he adjoined the land in dispute, timber was cut on his land; he complained to Thomas, who said he had nothing to do with it and sent witness to John; he said he was only a renter under John.

N. Dunlop testified that Thomas told him the grain on the place belonged to John, who had bought the place; that he, Thomas, was nothing but a cropper or renter.

Isaac Pershing testified that Thomas told him that his brother

[McGinity *v.* McGinity.]

had come into the county shortly before, had some money ($2000) which he invested in the Mason land, that Thomas was going to farm it, because he was a farmer, and John was not.

The plaintiffs asked the court, amongst other prayers, to instruct the jury, "that by the contract between John and Thomas seven years were given to pay the debt, and until after that time the limitation would not commence to run." To which the court replied, "This is answered in the affirmative if the jury find the facts to be so."

The following are points submitted by the defendants with the answers of the court:—

3. "If after this arrangement, Thomas leased the land from John, went into possession under it, disclaimed title, and held himself out as John's tenant, then he himself denied and abandoned his equity, and the law will refer to the lease to determine the character of his possession, as well as the extent of his interest in the land; nor will equity go behind it to seek for him a different one."

"Answered in the affirmative if the jury believe there was such a lease as the point contemplates, the entry on the report of distribution in the Orphans' Court of the payment of rent would not be evidence of a tenancy to affect the parties in this case, and if offered for that purpose would have been rejected."

4. "Even if the alleged arrangement had been well proved, had been good against creditors, and Thomas McGinity had gone into possession in pursuance of the same, and his heirs had been unlawfully ousted by John after his death in April 1853, still they are not entitled to recover in this action brought in 1860, inasmuch as being ousted in 1853 their right of entry then accrued, if they had any. The 6th section of the Act of 22d April 1856 required them to bring their actions within two years from the date thereof, and not having done so they are barred."

Answer: "This point, under the circumstances of the case, is answered in the negative. I do not think that if the jury believe Thomas's money paid for this land, and John took the deed to secure the money he advanced for Thomas, and afterwards got possession and received the profits till reimbursed his advancements, that he or his descendants could hold after being paid, and Thomas's children, having no right of entry without reimbursement, can claim to hold under the five year limitation."

5. "Taking all the evidence in this case, it does not make out a case in which a chancellor would interfere on the part of the plaintiffs."

"Answered in the negative, as the facts must be found by the jury, who are the judges of the credibility of the witnesses."

The court further charged:

"The first question is, who was the purchaser of this land? Was it Thomas McGinity or John? Who was designed to be the

[McGinity v. McGinity.]

real, beneficial owner? Whose money paid for it? If Thomas's
money paid for it, or principally so, and John only loaned or
advanced to Thomas a balance to be paid back, and took the deed
for that purpose, he would be the real owner.

"The next question is as to the sufficiency of the evidence. If
believed by the jury, we think there is a sufficiency to submit the
question to them. There are some contradictions, and the jury
are the judges; the evidence, to render a deed into a trust, ought
to be clear and satisfactory.

"The next is the question of the lease, as an estoppel [the evi-
dence on the subject of the lease is very unsatisfactory; the entry
in the auditor's report is not evidence of the fact].

"We instruct the jury, that under all the circumstances, the
limitation in the Act of 1856 does not bar this action."

The verdict was for the plaintiffs. The defendants removed
the case to the Supreme Court, and assigned for error the instruc-
tions of the court in answer to the points and that part of the
charge enclosed in brackets.

*E. Cowan* for plaintiffs in error.—The case was within the Act
of April 22d 1856, § 6, Pamph. L. 532, Purd. 654, pl. 1; Warfield
*v.* Fox, 3 P. F. Smith 386. When on the trial of an ejectment
on an equitable title the court is of opinion that the facts proved
do not make a case in which a chancellor would decree a convey-
ance they should give a binding charge: Moore *v.* Small, 7 Har-
ris 461; Poorman *v.* Kilgore, 2 Casey 371; Rankin *v.* Simpson,
7 Harris 471; Brawdy *v.* Brawdy, 7 Barr 157; Strimpfler *v.*
Roberts, 6 Harris 283; Todd *v.* Campbell, 8 Casey 252. The
plaintiffs could not recover till the defendants were reimbursed:
Thomas *v.* Wright, 9 S. & R. 87.

*A. A. Stewart* and *H. D. Foster* for defendants in error, cited:
Act of 1856, *supra,* §4; Miller *v.* Franciscus, 4 Wright 335.
Thomas having been in possession till his death the statute would
not run against him: Clark *v.* Trindle, 2 P. F. Smith 492; Wil-
lard *v.* Willard, 6 Id. 119. Besides the deed having been taken
to secure John's loan, the case is not within the statute.

The opinion of the court was delivered, January 3d 1870, by

SHARSWOOD, J.—The most important question which arises on
this record, the decision of which will dispose of the third, fourth
and fifth assignments of error, is, whether there was sufficient evi-
dence either of a resulting trust, or that the deed was a mortgage.
Both these things may, no doubt, be proved by oral testimony,
but it is equally certain that the evidence ought to be clear, ex-
plicit and unequivocal.

If it is true that Thomas McGinity bought this farm, with four-

[McGinity v. McGinity.]

teen hundred dollars of his own money, and six hundred dollars borrowed of his brother John, an absolute deed having been made to John as security for the repayment of this loan, then, indeed, the possession and enjoyment of it by the defendant below is a great wrong, not to the plaintiffs, however, but to the creditors of their father. For, when his estate was finally settled in the Orphans' Court, after his death, within five years from this transaction, the amount of his debts, as reported by the auditor, was $1906.09, to pay which, all that remained was $48.85. The whole of the alleged interest of Thomas in the farm would have been insufficient to have paid them. Had it produced, on a sale, the same price as was given for it, after repaying John his $600, there would have been about seventy-five cents on the dollar for them: as it was, they received but three. We come, then, to the consideration of the evidence, with a very strong presumption against the alleged trust or mortgage. Thomas lived on the farm from the time of the sale to his death, more than two years. Nobody in the neighborhood could have believed or suspected that he had any interest in it, so profoundly must the secret have been kept between these three men, John and Thomas McGinity and John Mason. Creditors are usually vigilant and sharpsighted in looking after their rights, and such a fact as this now alleged, could not have escaped them. John Mason, indeed, had left the county, but where was Mendal, who drew the articles, Armstrong, who drew the deed, or Esquire Rutledge, before whom the deed and mortgage were executed and acknowledged? John McGinity, or his family, were then in possession. The widow of Thomas claimed and was allowed her three hundred dollars out of his estate. So that we are warranted in believing that not a syllable of the matter was breathed at that time, either by the widow or any one of his friends or acquaintances. There was, also, certainly some evidence, apart from the record of the Orphans' Court, that Thomas had held himself out as the tenant of John; though the judge gave it as his opinion that the evidence on the subject of the lease was very unsatisfactory: it is not easy to comprehend why. Thomas, while in possession, told his neighbor, Daniel Dunlap, who applied to him about the repair of a line fence between them, that "he had nothing to do with it: was only a renter under John." He said the same thing to Nathaniel Dunlap, that "he was nothing but a cropper, or renter." He referred him to John, to get the cutting of the grain which Mason had put in, and he got it from John, who employed and paid him. Moreover, he told Isaac Pershing, about the time of the transaction, that it was his brother who had the money "that he invested in land, the Mason farm." "He was going to farm it, because he was a farmer, and his brother John was not." The testimony of B. Hanna and Ralston are to some declarations, and not very con-

[McGinity *v.* McGinity.]

sistent, for at one time John told Ralston that the farm "would be Thomas's finally : he was trying to help him along."

We come to the examination of the testimony of John Mason, upon which the whole cause rests. The credit of the witness was for the jury; but especially in a case where a trust, or the conversion of an absolute deed into a mortgage is attempted to be made out, by parol evidence, the court and jury exercise the functions of a chancellor, and the evidence, assuming the testimony of the witnesses to be true, ought to be such as would satisfy his conscience. "The judge alone is the chancellor. The province of the jury is to aid him in ascertaining the facts out of which the equities arise. If the facts are not disputed, he is to declare their effect, and determine whether the claim or the defence is well founded. A chancellor is judge, both of the equity and of the facts. It is in his discretion whether he will send an issue to a jury. And if he does, their verdict is only advisory. It is not conclusive upon him. Whenever, therefore, upon the trial of an ejectment, founded upon an equitable title, the court is of the opinion that the facts proved do not make out a case in which a chancellor would decree a conveyance, it is their duty to give binding instructions to that effect to the jury:" Strong, J., in Todd *v.* Campbell, 8 Casey 252. There was no sufficient evidence in the testimony of Mason, of a resulting trust. That arises from the fact of the payment of the purchase-money, or that it was the money of the alleged *cestui que trust* which was paid. There was no evidence that Thomas had paid $1400, and borrowed $600 of John, to make up the balance. The evidence was very distinct that John had paid the hand money: indeed, it is not denied, for it is pretended that was part of the $600 which he was to lend. "After the article was drawn," says the witness, "John put his hand in his pocket-book, and counted down not quite $200, and had not quite enough, and he turned to Thomas and asked him for it, and he got it." So in regard to the payment made on the execution of the deed. "John took out his pocket-book, all standing around, and counted out $1400, paper money." John executed the mortgage to secure the balance of $400, and the witness adds: "John paid the balance of money on mortgage." Moreover, there was not a scintilla of evidence that Thomas ever had in his name so much money. Mason testifies, indeed, that Thomas told him that his money was in Holmes' "brokers" office, in Pittsburg. But no evidence was given of this most material fact. Here was an index pointing directly to the place where the evidence could be had—evidence of the fact that Thomas had the money there and drew it out at that time, a fact, if proved, worth more than any declaration. The plaintiffs must be presumed to have known what Mason would testify, and it was a pregnant circumstance, that no attempt was made to prove in any other way,

[McGinity v. McGinity.]

than by Thomas's own declaration, that he had so large a sum of money at his command.    It is particularly so, in connection with the fact that his estate proved to be insolvent.    Nor was there any evidence of an admission by John, at any time afterwards, that Thomas had paid any part of the purchase with his own money. Parol evidence of conversations and negotiations, prior and lead- ing to a written contract, are inadmissible to vary it, but though they certainly may be shown to prove a fraud or trust, they should be accompanied with clear evidence that the arrangement continued the same up to the time of the execution of the writing. The whole evidence, indeed, here, consists of Mason's testimony of conversations with Thomas and John before the sale took place, as to how the payment was to be made.    What occurred, at the time either the articles or the deed was executed, was very vague and insignificant.    Then was the time when we ought to expect that there would have been a clear recognition of the terms of the arrangement.    No bystander could possibly have understood any- thing else from what transpired at both those times, than that John was buying and paying for the property.    If the fact was otherwise, it can only be accounted for by supposing that, for some reason not explained to Mason, there was a settled purpose to con- ceal it.    At the execution of the articles, Thomas again said that the money was at Holmes's, in Pittsburg, that he must go after it: but he does not appear then to have asserted that it was his.    Both the articles and the deed were handed to Thomas, to keep, with a declaration by John, " take that, it is for you," or " well, 'tis for you," the witness could not distinctly recollect which.    So much as to the resulting trust.    In regard to the effort to convert the absolute deed into a mortgage, the case rests on the same kind of evidence.    John admitted to Mason, that he had agreed to lend Thomas $600, and not charge him interest, for seven years; and, afterwards, he said, " if I loan him the $600, I must have the writings all drawn in my name.    I will article with you for the farm.    I will pay the money, and hold the land as security, till the $600 is paid back."    This action of ejectment does not appear to have been commenced until after John's death.    It would be of the most dangerous consequence, to permit a jury to sweep away a man's farm from his widow and children, after his death, by the breath of a single witness, of conversations and declarations of this loose and indefinite character.    The only writing produced was inconsistent with the story.    It was Mason's own letter to John, in which he recognises clearly him, and him only, as the purchaser, and that he was to pay all the money.    We think, therefore, that there was not sufficient evidence to go to the jury.

It remains to consider the first two assignments of error, which relate to the record of the Orphans' Court.    That record was offered, objected to generally, and admitted for the defendants.

The plaintiffs did not require, as they might have done, that the object of the offer should be stated, and then the evidence, if admitted, could have been limited to that object. The defendants may have had, therefore, some reason to believe, when it was admitted generally, that it was good evidence of any fact which appeared on its face. It showed a decree of the court in favor of John, for one year's rent of the farm, due him by Thomas, on a lease dated January 1st 1851. It is highly probable, then, that the defendants were taken by surprise, when the learned judge instructed the jury that "the entry in the auditor's report was not evidence of the fact" of a tenancy. In this, he was clearly right. The plaintiffs were neither parties nor privies to that proceeding: Sample *v.* Coulson, 9 W. & S. 65. The judge was bound to admit the record in evidence, if it was admissible for any purpose, and it was clearly admissible to show the insolvency of Thomas's estate. There was no error, therefore, in this instruction. For the surprise, the remedy of the plaintiffs was by a motion for a new trial. On another trial they may be able to show the existence and loss of the lease, by other testimony.

Judgment reversed, and *venire facias de novo* awarded.