## Jacob Thudium, Plff., in Err., v. A. C. Yost.

Parol evidence is admissible to show a verbal contemporaneous agreement which induced the execution of the written obligation, although it may have the effect of changing the terms of the same; but such evidence must be clear, precise, and indubitable.

In an action by a lessee against his lessor for failure to deliver possession, evidence was offered to show that, pending negotiations between the parties for the lease, plaintiff was fully informed that the lease of the tenant then in possession would not expire until April 1, 1887, and that he could not obtain possession before that time unless he purchased the furniture and the unexpired term, and that defendant would not lease the premises prior to that time except upon that condition; that defendant signed the lease on the understanding that plaintiff had complied with the condition, which, as a matter of fact, he had not done; the tenant having refused to give possession this suit was brought. *Held*, that it was error to withdraw this testimony from the consideration of the jury.

(Argued May 3, 1887.    Decided October 3, 1887.)

January Term, 1887, No. 136, E. D., before MERCUR, Ch. J., GORDON, TRUNKEY, STERRETT, GREEN, and CLARK, JJ.    Error to the Common Pleas of Cumberland County to review a judgment on a verdict for plaintiff in an action of covenant.    Reversed.

Plea, covenants performed, etc.

The only assignment of error was based on the answer of the court to plaintiff's first point which was as follows:

The evidence produced by the defendant under the offer to show that plaintiff made fraudulent representations to the defendant, which were relied upon by the defendant, and except for which defendant would not have executed the lease of August 31, 1885, wholly fails to make good the offer under which

it was admitted; and being insufficient in law to avoid the lease or affect the plaintiff's rights thereunder, the court is respectfully asked to strike out all the evidence which was received under said offer, and to instruct the jury to wholly disregard the same.

*Ans.* This request is granted. We do not think that the evidence was so clear and precise that Thudium was induced by reason of the fraudulent representations of Yost to sign the lease as to justify its submission to you for your consideration in the determination of the rights of the parties to this action.

The evidence which the court in its said answer declared was not sufficient to justify its submission to the jury was as follows:

Jacob Thudium testified:

In the month of June, 1885, in the forenoon, Mr. Zeigler, clerk at Woodward's warehouse (I am well acquainted with him), brought Mr. Yost to my house, and introduced Mr. Yost to me as a landlord in Greencastle. They sat in the room awhile; he told me his business and what he was after. Zeigler said: "He is a landlord from Greencastle; he understands his business well; he wants to rent the Mansion House." I told him that the house could not be rented unless he consulted with Mrs. Wilder, for she had a lease for another year. I stated to the gentleman that I was wrongfully informed as to the lease, and I went to see Mr. Hepburn and asked him whether it was correct.

Mr. Yost and I went over to the Mansion House.

*Q.* By the Court: This was in June?

*A.* This was in June: I didn't promise him the house that day; made no arrangements; I said I would consider him along with the rest; there were five or six applicants for the house, provided Mrs. Wilder was willing to quit. Shortly afterwards he came again. Mr. Klink said: "Yost is upstairs with Mrs. Wilder in the parlor," I should go up. They commenced to talk about buying out. I told it there to Mr. Klink, Mrs. Wilder, and Mr. Yost, that I would lease to Mr. Yost when he would make a bargain with Mrs. Wilder to buy her out. Mr. Yost said that could be easily arranged, that he was willing to buy her out.

There was nothing more done that day. Mr. Yost came down stairs and went out, and said he would be back again and try to make arrangements with Mrs. Wilder. He sent for me to

come up stairs. I went to the Mansion House and Mr. Klink told me, and I went up and found Mr. Yost and Mrs. Wilder in the parlor talking about the appraisement. Mr. Klink said that Yost said he offered her $500. I was not present. Klink came down and told me. Mr. Yost came down and I asked him how he made out. He said: "I agreed to buy her out, and gave her $500 under the article of agreement." This is as far as I know. Mr. Yost went home and sometime in the latter part of August or September, I think, he came to the house and said I should go along and see Mrs. Wilder. I went with him and he said he had made the arrangement and that Mr. Landis would make an article between Mrs. Wilder and Mr. Yost as regards buying out the furniture. I said I had nothing to do with that, that I hadn't a dollar's worth of furniture in the house; "you must deal with Mrs. Wilder." Then I went around the hotel, I went back to the kitchen and asked Mrs. Wilder whether it was satisfactory to her, if she was willing to get out. She said "Yes." Mr. Yost then said that when the article is made between him and me, that then Captain Landis would make an article between him and Mrs. Wilder, and then he would pay $500.

*Q.* By the Court: Did he say so, that when the agreement was made between you and him, then he would make an agreement with Mrs. Wilder?

*A.* He went to Captain Landis, or promised to go there and make that lease. I asked him then when he would pay the $500. He said as soon as the article was made between Mrs. Wilder and Yost, that Captain Landis had an agreement. Before I went up to sign the lease I asked Mrs. Wilder whether it was all right. She said: "You can lease to him; I am willing to go out; I am tired of it." I asked Mr. Yost in the presence of Mrs. Wilder in the back yard, how much he must give beside the $500, and he said they would leave it to the appraisers; that Mrs. Wilder would fix one appraiser and Mr. Yost the other, and those two would get another, and that they would go through the house and appraise the things. Yost had to pay cash for the goods.

*Q.* Then you went and made your agreement, did you?

*A.* Yes, sir.

*Q.* What did you say to Mr. Yost as the reason why you couldn't give him possession on the first of April?

*A.* Mrs. Wilder would not give him the house unless he paid the money. She would not give up possession.

Mrs. Elizabeth Wilder testified:

*Q.* You are the present tenant in the Mansion House?

*A.* Yes, sir.

*Q.* Will you please state whether in the summer of 1885 you had an interview with Mr. Yost in reference to the leasing of the Mansion House, and whether or not in his presence and in the presence of Mr. Jacob Thudium you had a conversation about it, and if so, what was said to him about your lease, and what he was to do?

*A.* He came there and asked me whether I would sell out to him. I told him I would. He had heard Mr. Kreps was there.

*Q.* Sell out what?

*A.* My furniture. I said I would. He asked if Mr. Kreps was trying to buy, and I told him he was. He asked me what Mr. Kreps had offered. I told him his bargain was to take the things at the appraisement, and he would give me $100 as a forfeit. He hooted at that and he said, "That is nothing; I will pay you $500." I said, "That is all I want, good security." So he said he would buy me out then. Mr. Thudium was there with him. I said: "Another thing," I said, "I have got the lease of the house for another year." He says, "You have?" I said, "Yes, sir."

*Q.* Who said?

*A.* Yost. He says: "You have the lease of the house for another year?" I said, "For another year from the first of April." He says: "You will give up the lease to me?" I says: "Yes, sir; if you buy me out I will give it up."

*Q.* Was Thudium present when this occurred?

*A.* Yes, sir. Mr. Thudium says: "Whenever you make it satisfactory with Mrs. Wilder, I will talk to you about the house. I will rent you the house, but there is no use of my talking to you unless you make it satisfactory with her .first. I have nothing to say unless you do that." He said: "That is all right; I will make it satisfactory with her, if I just get the lease of the house." After that he never asked me for the lease I had, Mr. Yost didn't.

*Q.* When was this?

*A.* I can't just exactly say when it was, but a couple of days after Mr. Kreps was there.

*Q.* It was in the summer of 1885?

*A.* Yes, sir.

*Q.* State whether or not he gave you $500, and what he said about it afterwards, or about the time you spoke to him about putting up $500?

*A.* They went out I suppose to Captain Landis' office.

*Q.* When was this?

*A.* A couple of days after Mr. Kreps was there; I don't suppose more than two days.

*Q.* When they came back what occurred?

*A.* When they came back they had an article of agreement made. I told Mr. Yost I wouldn't make any article of agreement until I saw Mr. Hepburn. I would be willing to sell out, but I wouldn't make any arrangement until I saw Mr. Hepburn. He went out and got an article made and asked me to sign it. Captain Landis wanted to know why it was that I wouldn't sign it. I told him that I told Mr. Yost that I wouldn't sign it unless I saw Mr. Hepburn. He said: "I will read it to you." I said it wasn't right; that he had nothing in it about the $500; that he was to pay me $500, as a forfeit. I asked him if he was going to pay it, and he said he wasn't. I said: "Are you going to give security?" He said: "You know me; I am good for $500." I said: "That may be; you may be good for $500, and you may be good for $1,000; but I don't know you." He asked me if I would put my name to that paper. I said, "No." Captain Landis thought it was very strange. I told him I didn't know they were going to make an article; I told him I wouldn't sign unless Mr. Hepburn would see the paper.

*Q.* Then the matter was not satisfactorily arranged; he didn't buy you out?

*A.* No, sir.


Alexander Klink testifies:

*Q.* It is agreed that the time Mr. Kreps was down was on the 29th of August, 1885. State whether you heard any conversation between Mr. Thudium and Mr. Yost as to the leasing of this hotel before the 31st of August, 1885; what it was and where; you are clerk at the Mansion House?

*A.* Yes, sir; Mr. Yost came down and got off the train sometime in the latter part of August. I met him, I think, at the

hall door and I told him to go up in the parlor. He said he wanted to see Mrs. Wilder and Mr. Thudium and I sent him up. I went over to see Mrs. Wilder and got her to go over into the parlor. Then I came down stairs, and Mr. Thudium was in the office, and I said: "Mr. Yost is up in the parlor." He says: "I telegraphed to him," or something like that; he said he couldn't have left home since the time he telegraphed; he must have come without telegraphing. They got talking there about the lease of the house.

*Q.* Did you go up with him?

*A.* Yes, sir; he sat right down near the window next the veranda. Mrs. Wilder was there, Mr. Yost, Mr. Thudium, and myself. They then got to talking about buying Mrs. Wilder out, and about leasing the house. Mr. Thudium then remarked to Mr. Yost: "If you buy Mrs. Wilder out, I will lease you the house." Mrs. Wilder told Yost then that Mr. Kreps was down to see about buying her out, and that he offered to give her $100, as a forfeit. Mr. Yost hooted at the idea and he says: "I will make it $500." Mrs. Wilder says: "That is all right; that is all I want." That is about all the conversation I heard there; I went down stairs.

*Q.* State whether or not anything was said about the lease?

*A.* Mrs. Wilder said if he would buy her out she would give him the lease.

*Q.* Did she say how long it was to run?

*A.* One year.

*Q.* To what time?

*A.* From '86 to '87.

*Q.* She told him that?

*A.* Yes, sir. What happened afterwards I don't know. I was called down stairs to the office.

*Q.* Did you hear anything that occurred in the office between Thudium and Yost?

*A.* I heard a conversation one day in the bar-room.

*Q.* Before or after this?

*A.* That was before. The barkeeper was there and Mr. William Cornman, Mr. Thudium, and Mr. Yost, and myself. Mr. Thudium remarked: "If you buy Mrs. Wilder out, I will lease you the house; make it satisfactory to her." That is all the conversation.

*Q.* What did Yost say?

*A.* I don't know what he said, more than that would be all right, or something to that effect; I don't remember exactly.

Cross-examination.

*Q.* Have you given us all the conversation you can remember?

*A.* Yes, sir; that is all.

*Q.* What were they talking about buying out?

*A.* Buying the furniture of the house.

*Q.* Mr. Thudium said if Yost would buy the furniture, then he would lease it?

*A.* Yes, sir.

*Q.* When Mrs. Wilder said that her lease ran for another year, what did Thudium say?

*A.* I don't know that he made any reply; I don't remember that he did; he said: "Only so you make it satisfactory with Mrs. Wilder."

*Q.* Did you hear any further conversation between the parties that day at any time?

*A.* No, sir; I was called to the office to attend to the business of the office, and I didn't hear anything more between them.

William H. Cornman testified:

*Q.* State whether you heard the conversation between Mr. Thudium and Mr. Yost?

*A.* I did; yes, sir.

*Q.* Who were present?

*A.* Mr. Klink, Mr. Williamson, Mr. Thudium, Mr. Yost, and myself.

*Q.* Where was it?

*A.* It was in the bar-room of the Mansion House.

*Q.* State what it was as near as you recollect?

*A.* They were talking in the Mansion House, and I heard Mr. Thudium say to Mr. Yost if he would buy Mrs. Wilder's furniture and make a satisfactory arrangement with her, he would lease him the house. Mr. Yost said he would make everything satisfactory with her.

A. C. Yost, the plaintiff, testified on cross-examination:

*Q.* Do you know Mr. John Park, in this town, a butcher?

*A.* Yes, sir; I do.

*Q.* Did you say to him some time in August, 1885, that you

knew Mrs. Wilder had a lease for that house for another year, and that you would have to buy her out before you could get a lease from Thudium?

*A.* Not as I remember of.

*Q.* Do you say you that didn't say so?

*A.* Please repeat that question.

*Q.* Did you say to Mr. John Park, in August, 1885, before your lease, that you knew that Mrs. Wilder had a lease on the house for another year, and that you would have to buy her out before you could get a lease from Thudium?

*A.* Not as I remember of, no, sir.

John Park testified:

*Q.* You heard the question I just put to Mr. Yost. Just go on and state whether or not any such conversation occurred, and when and where.

*A.* There was a conversation of that kind occurred between Mr. Yost and me in the Mansion House.

*Q.* When?

*A.* It was sometime in August; I don't know whether it was the beginning of August or the latter part of August.

*Q.* Go on and state what he said.

*A.* He said he had come to lease the Mansion House, but he had found out that he couldn't get a lease on it unless he could make some arrangement with Mrs. Wilder; that she had a lease for another year on it, and he was going to try to buy her out. I believe they did get together toward the last to make a bargain. That is all the conversation we had at that time. Different times we talked about it.

*Q.* Anything at any other time to the same effect, or anything like it?

*A.* No, sir; not exactly.

Other material facts appear in the opinion.

Verdict and judgment for plaintiff.

*F. E. Beltzhoover* and *Hepburn, Jr., & Stuart,* for plaintiff in error.—Parol evidence is admissible to establish a contemporaneous oral agreement which induced the execution of a written contract, though it may change or reform the instrument; but such evidence must be clear, precise, and indubitable. Spen-

cer v. Colt, 89 Pa. 314; Phillips v. Meily, 106 Pa. 536; Thomas v. Loose, 114 Pa. 35, 6 Atl. 326.

A written agreement may be modified, explained, reformed, or altogether set aside by parol evidence of an oral promise or undertaking material to the subject-matter of the contract made by one of the parties at the time of the execution of the writing and which induced the other party to put his name to it. Walker v. France, 112 Pa. 203, 5 Atl. 208.

No principle has been better settled by a long line of decisions than that parol evidence is admissible to show a verbal contemporaneous agreement which induced the execution of a written obligation, although it may have the effect of varying or changing the terms of a written contract. Brown v. Morange, 108 Pa. 75.

Parol evidence is competent where there has been an attempt to make a fraudulent use of the instrument in violation of a promise or agreement made at the time the instrument was signed and without which it would not have been executed. Phillips v. Meily, 106 Pa. 536.

To materially vary or contradict a written contract by evidence of a contemporaneous parol agreement it must be alleged that the contract was executed on the faith of the parol agreement. Callan v. Lukens, 89 Pa. 134.

Where at the execution of a writing a stipulation has been entered into, a condition annexed, or a promise made by word of mouth, upon the faith of which the writing was executed, parol evidence is admissible, although it may vary and materially change the terms of the contract. Greenawalt v. Kohne, 85 Pa. 369.

To pave the way for the admission of oral declarations to vary a written instrument it is not necessary to prove that a party was actuated by a fraudulent intention at the time of the execution of the writing; for although his original object may have been honest and upright, if to procure an unjust advantage he subsequently denies the parol qualification of the written contract, it is such a fraud as will operate to let in evidence of the real intent and conclusion of the parties to the instrument. Lippincott v. Whitman, 83 Pa. 246.

A verbal promise at the making of a written contract, if made to obtain its execution, may be given in evidence. Graver v. Scott, 80 Pa. 88.

When a promise is made by one in consideration of the execution of a writing by another the promise may be shown by parol evidence. Shughart v. Moore, 78 Pa. 469.

A verbal promise by one of the parties at the making of a written contract, if it was used to obtain the execution of the writing, may be given in evidence. Powelton Coal Co. v. McShain, 75 Pa. 238.

Conversations and negotiations prior and leading to a written contract are evidence to prove a fraud or trust. McGinity v. McGinity, 63 Pa. 38.

The plaintiff in error also desires to advert to the refusal of the court below to permit him to have the conclusion to the jury, under the pleadings in the case. The pleas were covenants performed and covenants performed with leave, which are affirmative pleas. Middleton v. Stone, 111 Pa. 590, 4 Atl. 523, and cases there cited.

The plea of covenants performed with leave is an affirmative plea. Zents v. Legnard, 70 Pa. 192.

Under this plea the affirmative of the issue is thrown upon the defendant and with it the right to conclude to the jury. Norris v. Insurance Co. 3 Yeates, 84, 2 Am. Dec. 360; Richards v. Nixon, 20 Pa. 19; Gebhart v. Francis, 32 Pa. 78; Abbott v. Lyon, 4 Watts & S. 38; Troubat & H. Pr. § 1533. See 4 Rawle, 283.

*Landis & Smead, J. M. Weakley,* and *John Stewart,* for defendant in error.—To collect or even to classify the cases in which this court has admitted parol evidence as a defense in actions founded on written contracts would be impossible and useless. They are found in almost every report. Many of them are in cases in which it was permitted to prove parol defeasance against a deed absolute on its face. This has been changed by the act of June 8, 1881.

Another class of cases is where the consideration named in the contract has been shown by parol evidence to include something that was not expressed in the written paper, and to prove that the recited consideration had failed. It is also admitted to prove identity of persons, or of property; to correct erroneous dates and to show the truth of the transaction, where from fraud, accident, or mistake the written contract does not disclose it.

These cases all recognize the general rule of the common law, —that a written contract is the best evidence of the agreement between the parties; that it is the consummation of their negotiations; and that it should not be altered or contradicted, except in such cases as a chancellor would feel bound to modify it or set it aside. Pennsylvania R. Co. v. Shay, 82 Pa. 198; Lippincott v. Whitman, 83 Pa. 244; Rowand v. Finney, 96 Pa. 197.

The facts and circumstances relied on must not be of doubtful import. It is not sufficient that they be merely consistent with the instrument's being a mortgage, they must be clearly inconsistent with its being an absolute conveyance. Titles regular and legal on their face cannot be swept away by parol evidence of doubtful facts or ambiguous inferences. Burger v. Dankel, 100 Pa. 118.

The order on which the court permitted the counsel to address the jury is not assignable as error. The supreme court will not reverse the court below for allowing counsel to speak in "wrong order." This was intimated in Marsh v. Pier, 4 Rawle, 284, 26 Am. Dec. 131, and was expressly ruled in Hartman v. Keystone Ins. Co. 21 Pa. 475, and in Smith v. Frazier, 53 Pa. 228.

OPINION BY MR. JUSTICE STERRETT:

It clearly appears from the evidence recited in the specification of error that pending the negotiations, between the parties, for the lease in suit, plaintiff below was fully informed that the lease of the tenant then in possession would not expire until April 1, 1887; that possession of the premises, before that time, could not be obtained by him or anyone else, without buying the furniture and unexpired term of the tenant, and that defendant would not lease the premises for a term commencing April 1, 1886, except on the condition that such purchase was made by the new lessee, and carried out in good faith; that on the condition above stated, and with the distinct understanding that plaintiff below had purchased the furniture and outstanding term of Mrs. Wilder, and made a satisfactory arrangement with her for possession on or before April 1, 1886, defendant was induced to sign the lease in controversy; that while plaintiff below had agreed to buy the furniture and interest of Mrs. Wilder, he had not in fact consummated the purchase, and afterwards refused to carry out, in good faith, his agreement with

her; and for that reason she refused to surrender possession of the premises.

Without referring in detail to the testimony of Thudium himself, Mrs. Wilder, Alexander Klink, and others, upon which defendant below relied, it is sufficient to say that if it had been submitted to the jury, with proper instructions, they would have been warranted in finding a state of facts substantially the same as the foregoing—facts that would have been a complete answer to plaintiff's claim for damages for nondelivery of possession on April 1, 1886.

There is no room for any doubt or difference of opinion as to the kind and degree of proof necessary to sustain a defense such as was interposed in this case.   Our books are full of cases on the subject, some of the more recent of which are McGinity v. McGinity, 63 Pa. 38; Powelton Coal Co. v. McShain, 75 Pa. 238; Shughart v. Moore, 78 Pa. 469; Graver v. Scott, 80 Pa. 88; Lippincott v. Whitman, 83 Pa. 244; Greenawalt v. Kohne, 85 Pa. 369; Callan v. Lukens, 89 Pa. 134; Phillips v. Meily, 106 Pa. 536; Spencer v. Colt, 89 Pa. 314; Brown v. Morange, 108 Pa. 69; Walker v. France, 112 Pa. 203, 5 Atl. 208; Thomas v. Loose, 114 Pa. 35, 6 Atl. 326.

In Brown v. Morange, 108 Pa. 69, it is said: "No principle has been better settled by a long line of decisions than that parol evidence is admissible to show a verbal contemporaneous agreement which induced the execution of a written obligation, though it may have the effect of varying or changing the terms of the written contract;" or as the same idea is expressed in Walker v. France, 112 Pa. 203, 5 Atl. 208, "a written agreement may be modified, explained, reformed, or altogether set aside by parol evidence of an oral promise or undertaking, material to the subject-matter of the contract, made by one of the parties at the time of the execution of the writing and which induced the other party to put his name to it."

But, while parol evidence is admissible to establish a contemporaneous oral agreement which induced the execution of a written contract, although it may change or reform the instrument, such evidence in the language of all the cases must be "clear, precise, and indubitable."   By these words it is meant, as defined in Spencer v. Colt, 89 Pa. 314, that it shall be found that the witnesses are credible; that they distinctly remember the facts to which they testify; that they narrate the details ex-

actly and that their statements are true. Absolute certainty is out of the question.

The difficulty is not so much in the principles themselves as in their application to particular cases.

An examination of the evidence on which plaintiff in error relies has satisfied us that, if believed by the jury, it was quite sufficient to have warranted a verdict in his favor, and hence the learned judge erred in not submitting it to the jury.

Judgment reversed and a *venire facias de novo* awarded.